UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BRENDA L. BROWN, | ) | 1:06cv01696 DLB |
| | ) | |
| | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**BACKGROUND**

Plaintiff Brenda L. Brown ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

**FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff filed her application on December 3, 2003, alleging disability since June 14, 2001, due to a lower back injury. AR 81-83, 115-124. After being denied both initially and upon

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On February 9, 2007, the Honorable Oliver W. Wanger reassigned the case to the undersigned for all purposes.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 58-62, 65-69, 70. On April 27, 2006, ALJ James Ross held a hearing. AR 517-546. ALJ Ross denied benefits on June 27, 2006. AR 14-21. The Appeals Council denied review on October 5, 2006. AR 7-11.

<u>Hearing Testimony</u>

ALJ Ross held a hearing on April 27, 2006, in Fresno, California. Plaintiff appeared with her attorney, Robert Christenson. AR 517.

Plaintiff testified that she was 45 years old at the time of the hearing. She got her GED and then went to college for a psychiatric technician certificate. AR 521. In the past 15 years, she has done client care at two group homes. She stopped working in November 2001, after hurting her back in 2000. AR 522. She retired after her work restrictions could not be accommodated. AR 523.

Plaintiff testified that she has pain in her lower lumbar area and in her left leg. She has stenosis in her left leg and her neck hurts because she has arthritis. She also has arthritis in her hands and toes. Her right hand is worse than her left. Her toes are "crooked and curling up with arthritis." She has an appointment in July with a rheumatologist. AR 524. She also explained that she sometimes has pain in her right shoulder since an injury. AR 525.

Plaintiff explained that she was not taking strong pain medications because they caused stomach problems and GI bleeding. AR 525-526. She took Neurontin without problems. AR 526.

Plaintiff further testified that her right hand gets inflamed and that she has problems with her knuckles swelling up and getting stiff. Her right elbow also gets "stuck." AR 527. She has problems carrying things and thought that she could lift 10-15 pounds, but not frequently. She has problems grasping and holding onto things and testified that she couldn't open jars anymore. AR 527-528. If she writes for more than five minutes, her hands starts cramping and her fingers and wrist hurt. Plaintiff is right handed. Although she has a computer at home, she cannot work the keyboard because of the pain and because she really doesn't know that much about computers. AR 528. She has difficulty standing and thought that she could stand for about 30-

1  45 minutes.  If she stands for more than that, her back starts hurting and she gets pain at the top
2  of her left leg that starts going towards her foot.  AR 528.  She thought she could sit for about 30-
3  45 minutes and walk for two or three blocks.  AR 528-529.

4        Plaintiff takes rest breaks all day and thought that during an eight-hour period, she would
5  need to rest at least four times, for about an hour to an hour and a half each time, depending on
6  how she feels when she wakes up.  When she takes rest breaks, she goes to bed and goes to sleep.
7  AR 529.  When she sits, she normally sits in a recliner because sitting in a regular chair is
8  uncomfortable.  She wakes up throughout the night because of pain.  Massages and a heating pad
9  help, as well as sitting in a bath of hot water.  AR 530.

10       Plaintiff is able to take care of her personal needs.  AR 531.  During the day, she reads
11 books and talks to her husband.  She also rests on and off throughout the day.  They sometimes
12 go places, but not like they used to.  Her husband helps her with the groceries.  AR 532.  Plaintiff
13 also takes Xanax for anxiety and thought that it helped "some."  She thought that her anxiety
14 would interfere with her ability to work because she doesn't like being around people.  AR 533-
15 534.  She also testified that she has migraines about once a week.  AR 535.

16       Plaintiff had carpal tunnel release on her right hand first and then on her left hand.  AR
17 536.  She testified that her right hand has never been the same, and that if she turns her wrist a
18 certain way, "it feels like something jumps in here all the way up," like a nerve.  AR 536.  She
19 fixes meals, drives a car, does the laundry and rinses the dishes.  Her husband helps her with
20 cleaning and loading the dishwasher.  AR 537.

21       When questioned by the ALJ, Plaintiff explained that she hurt her back in September
22 2000, when she was lifting a patient.  AR 538.  She tried to return on limited duty but was having
23 spasms and couldn't.  AR 539.  She had a series of epidural injections, and although the first one
24 helped, she has had stenosis in her leg since the third one.  She has never seen a neurosurgeon but
25 has had physical therapy.  Plaintiff testified that she stopped therapy because it made her worse.
26 AR 541.  Plaintiff explained that she has been referred to a rheumatologist and that Dr. Kim has
27 told her to take Ibuprofen in low doses so that it doesn't upset her stomach.  AR 542.

28

1  Plaintiff did not believe that she could perform even a sedentary job because she has to
2  lay down a lot, as it's the only way she can cope with the pain. AR 545.

3  Medical Record

4  Plaintiff reported her first work-related injury in 1998, when she injured her right
5  shoulder, wrist and hand at work in October. In August 1999, she underwent a right wrist
6  arthroscopy and right carpal tunnel release. She was able to return to full work activities as a
7  psychiatric technician. AR 192.

8  An MRI of Plaintiff's right shoulder performed on September 22, 1999, revealed
9  tendinitis of the right rotator cuff and mild degenerative changes of the acromioclavicular joint,
10 with fluid in the subacromial space. AR 202.

11 In December 1999, Plaintiff reported that she no longer had any wrist or hand pain, and
12 that all numbness had resolved. AR 192. Gregory J. Hanker, M.D., opined that she could return
13 to work in a full-duty capacity without restriction. AR 193.

14 On September 17, 2000, Plaintiff underwent an orthopedic evaluation performed by
15 Edward J. Troy, M.D. Plaintiff complained of numbness and pain in her left hand, as well as
16 pain in her right hand, right shoulder, right elbow and left wrist. After reviewing her records and
17 performing a physical examination, Dr. Troy diagnosed status post dorsal synovectomy and right
18 carpal tunnel release, mild acromioclavicular arthritis and strained right shoulder, and possible
19 left carpal tunnel syndrome ("CTS"). He noted that she continued "to have some findings on
20 examination that would be somewhat non physiologic," and has increased subjective complaints
21 involving her right upper extremity. He explained that it was difficult to tell whether these were
22 valid complaints, and although her grip strengths were lower than those measured by Dr. Hanker,
23 "this was a very subjective volitional test and not truly objective." AR 235-244.

24 On October 13, 2000, Plaintiff saw Steven A. Schopler, M.D., for an orthopedic
25 consultation. Her chief complaint was lumbar pain with radiation down the right leg. Plaintiff
26 reported that she injured her back in September 2000, when she was lifting a client. After
27 physical examination, he diagnosed left L4-5 foraminal disc protrusion and L5-S1 disc
28 protrusion. He recommended that she resume physical therapy for at least six weeks prior to any

assessment of her work status, and that more aggressive treatment be considered only if therapy fails.  AR 352-354.

An MRI of Plaintiff's lumbar spine performed on September 26, 2000, revealed L4-5 foraminal disc protrusion on the left and small central disc protrusion at L5-S1.  AR 356, 361-362.  X-rays performed the same day revealed transitional vertebra at S1.  AR 357.

Plaintiff began physical therapy for her back in October 2000.  After reporting improvement for a while, she discontinued therapy in March 2001, after reporting that it exacerbated her lower back pain.  AR 248-262.

On February 5, 2001, Plaintiff was evaluated by James B. Billys, M.D.  Plaintiff reported numbness and tingling in her left arm at night, as well as during the day when she used her hand.  She also reported numbness and tingling in both the median and ulnar nerve distributions and a slight weakness in her grip strength.  AR 371.  After examination, Dr. Billys concluded that she had symptomatology consistent with a left CTS, and possibly cubital tunnel symptomatology.  AR 372.

On March 5, 2001, Plaintiff underwent a sensory nerve conduction study of her left wrist and median nerve.  The test suggested a demylinating median monomeuropathy at or distal to the wrist, i.e., CTS, very mild in degree electrically.  AR 288-289.

Plaintiff saw Dr. Schopler on March 16, 2001.  She reported that she was doing reasonably well until she experienced exacerbation of back and leg pain while performing exercises at physical therapy.  Dr. Schopler recommended a trial of lumbar epidural steroidal injections.  Plaintiff could return to work with no prolonged sitting, standing, or repetitive bending, lifting and stooping activities.  AR 346-347.

On March 22, 2001, Plaintiff underwent a lumbar epidural steroid injection.  AR 452.

Plaintiff underwent left carpal tunnel release on April 19, 2001.  AR 368.

Plaintiff returned to Dr. Schopler on April 27, 2001.  She reported fifty percent leg pain and fifty percent lower back pain on the left.  She felt reasonably well-managed using Darvocet, Flexeril and Vicodin.  On examination, her gait was normal and she was able to touch her fingertips to the level of her ankles.  Right and left straight leg raising were negative.  Motor

examination was normal in the lower extremities.  Dr. Schopler diagnosed L4-L5 and L5-S1 lumbar disc protrusions and indicated that Plaintiff was on limited duty due to CTS.  AR 344-345.

Plaintiff underwent lumbar epidural injections on May 8 and 22, 2001.  AR 358-360.

On May 30, 2001, Plaintiff was released back to her usual and customary duties after her left carpal tunnel release.  AR 367.

On June 14, 2001, Plaintiff was examined by Dr. Schopler.  On examination, her gait was normal and range of motion was minimally restricted.  Motor examination and deep tendon reflexes were normal.  Straight leg raising was positive for production of back pain on the left side.  There was moderate tenderness to palpation in the region of the lower lumbar interspaces.  Dr. Schopler also reviewed Plaintiff's September 2000, MRI.  He diagnosed intervertebral disc protrusions, L4-L5 on the left and L5-S1 central.  She could resume duty with avoidance of prolonged sitting, standing, repetitive bending, lifting and stooping, or heavy lifting activities.  AR 340-342.

In July 2001, Plaintiff reported that she was managing fairly well after her left carpal tunnel release, and has had good resolution of numbness and tingling.  She complained of increased symptoms on the right.  On examination, she had full range of motion of the shoulder, elbow, wrist and fingers, but had a mildly positive Tinel's over the carpal tunnel.  She also had tenderness over the first and second dorsal compartments and a positive Finkelstein maneuver.  Dr. Billys recommended that she begin hand therapy and placed her on Vioxx.  AR 365.

On September 4, 2001, Plaintiff reported that she continued to have symptomatology in her right wrist with mild numbness in the median nerve distribution.  These symptoms were consistent with a cumulative trauma syndrome.  Dr. Billys recommended that Plaintiff continue with therapy and started her on Neurontin.  AR 363.

On November 16, 2001, State Agency physician Ernest Wong, M.D., completed a Physical Residual Functional Capacity Assessment.  Dr. Wong opined that Plaintiff could occasionally lift 20 pounds, 10 pounds frequently, could stand and/or walk for about six hours in an eight hour day, and could sit for about six hours in an eight hour day.  Plaintiff was unlimited

1  in pushing and/or pulling.  She could frequently climb ramps and stairs and occasionally climb

2  ladders and ropes.  She could frequently balance, kneel and crawl, and could occasionally stoop

3  and crouch.  Plaintiff needed to avoid concentrated exposure to hazards.  AR 373-380.

4       On November 19, 2001, Plaintiff underwent an injection of her first dorsal compartment

5  on the right.  AR 415.

6       On November 20, 2001, Plaintiff saws Arthur H. Holmboe, M.D., for an Agreed Medical

7  Examination.  Dr. Holmboe reviewed Plaintiff's medical records and performed an examination.

8  On palpation of her lower back, there was diffuse tenderness about the lumbar area and she

9  complained of a mild low backache when squatting.  Although hyperextension caused increased

10 discomfort, other motions did not.  Waddell's signs were positive for passive rotation, but

11 negative otherwise.  Examination of her lower extremities was normal.  Sensory examination in

12 both upper extremities was normal and there was no tenderness in either wrist.  Finkelstein's test

13 was negative, as was Phalen's test.  There was no Tinel's sign in either wrist.  AR 399-408.

14       Dr. Holmboe diagnosed a history of MRI scan showing multi-level degenerative disc

15 disease, lumbar spine, mild; lumbatization, S1, with continuing chronic back pain; status

16 postoperative left carpal tunnel release; status postoperative right carpal tunnel release and wrist

17 exploration with arthroscopic debridement; and a history of subacromial bursitis, right shoulder,

18 relieved with steroid injection.  AR 408.  He determined that Plaintiff's primary problem was in

19 her low back, as she has continual pain without pain-free intervals.  He suggested that she was

20 precluded prophylactically from heavy lifting, repeated bending and stooping and prolonged

21 sitting.  As to her wrists, she did not appear to have any significant symptoms in her right wrist,

22 but on the basis of her history of surgeries bilaterally, she should be precluded from repetitive

23 forceful gripping and grasping activities with either hand, and from the use of rapid repetitive

24 motions or vibratory tools, including jackhammers.  AR 409.

25       On January 18, 2002, Dr. Billys issued his final report.  Plaintiff continued to complain of

26 intermittent pain in her right upper extremity in the medial parascapular area and in the area of

27 the first dorsal compartment.  AR 412.  She had full range of motion in her shoulders, elbows,

28 wrists and fingers and intact sensation distally.  Motor strength was 5/5 in the upper extremities,

although she had some mild tenderness over the first dorsal compartment. AR 412. There was also mild tenderness over the right medial parascapular region. Dr. Billys diagnosed left CTS, cumulative trauma symptomatology, bilateral upper extremities, and De Quervain's tenosynovitis, right wrist. AR 413. He opined that Plaintiff could carry out her usual and customary duties at work and did not need any restrictions. AR 413.

Plaintiff was seen by Rosalinda Serrano, M.D., for a consultive examination on April 24, 2004. Her chief complaint was low back pain. She reported that she was able to cook, do light housekeeping, drive and wash the dishes. Plaintiff sat comfortably during the examination and walked without abnormalities. She was able to do tandem, heel and tiptoe walking but had difficulty standing on her toes. She was not able to reach the floor and could only bend up to her knees. Straight leg raising was done passively to 50 degrees bilaterally. She had pain and tenderness on palpation of the paravertebral muscles at L4/L5, as well as difficulty sitting up from the supine position. Motor strength was 4/5 in the bilaterally upper extremities and grip strength was 5/5. There was no evidence of any sensory abnormalities. Dr. Serrano diagnosed a history of bilateral CTS and releases; sprain/strain to the lumbosacral spine; lumbar disc disease; excision of right wrist ganglion cyst; history of seizure disorder; and lumbar radiculitis bilaterally. AR 432-436.

Dr. Serrano opined that Plaintiff could stand and/or walk for six hours in an eight hour day, and sit for six hours in an eight hour day. She could lift and/or carry 20 pounds occasionally and 10 pounds frequently. She was restricted in bending, kneeling, crouching and crawling because of her low back pain and restricted range of motion. Dr. Serrano determined that Plaintiff had no manipulative limitations and that she had full use of her upper extremities. She had to avoid working at heights. AR 436-437.

On June 18, 2004, State Agency physician James V. Glaser, M.D., completed a Physical Residual Functional Capacity Assessment. Dr. Glaser opined that Plaintiff could occasionally lift 20 pounds, 10 pounds frequently, could stand and/or walk for about six hours in an eight hour day, and could sit for about six hours in an eight hour day. Plaintiff was unlimited in pushing and/or pulling. She could occasionally climb and stoop and could frequently balance, kneel,

crouch and crawl. AR 438-445. These findings were affirmed on November 9, 2004. AR 445, 451.

Blood tests performed in August 2004 were negative for ANA and rheumatoid factor. AR 472.

In November 2004, Plaintiff reported that her bones hurt all the time. AR 467.

X-rays of Plaintiff's lumbar spine taken on December 7, 2004, revealed minimal early multi-level spondylolisthesis with the early anterior spurs. It was otherwise unremarkable. AR 464.

A February 2005, MRI of her cervical spine revealed significant degenerative disc disease at C5-6 and C6-7, but no focal significant cervical disc protrusion and no spinal stenosis. AR 458-459.

In March 2005, Plaintiff reported that she was still tired, but that Xanax was "really helping" with her anxiety and that she was sleeping better at night. She complained of low back pain and upper back pain that sometimes radiated into her arm. AR 458.

In February 2006, Plaintiff reported that all of her joints hurt. She was referred to Dr. Boninski. AR 470.

On March 20, 2006, Plaintiff saw Frederick Young, M.D. for orthopedic evaluation of complaints of multiple pain at her joints with a history of fatigue and aching. Plaintiff has been unable to take anti-inflammatory because of GI problems and this has made things worse. Dr. Young opined that Plaintiff should be evaluated by a rheumatologist, who should consider whether Plaintiff has fibromyalgia or chronic fatigue syndrome. AR 511.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of degenerative disc disease of the lumbar and cervical spine, and a history of bilateral CTS, status post surgery on both wrists, which appears resolved. AR 18. Despite this, she retained the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally and 10 pounds frequently, to sit, stand and/or walk for six hours in and eight hour day, and to occasionally stoop and climb. She could not perform repetitive forceful twisting with either hand. AR 19. Although Plaintiff could not

perform her past relevant work, she could perform a significant number of positions in the national economy. The ALJ based his decision on Medical-Vocational Rule 202.21, and in doing so, concluded that her nonexertional impairments had little or no effect on the occupational base of unskilled light work. AR 20-21.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" (degenerative disc disease of the lumbar and cervical spine, and a history of bilateral CTS, status post surgery on both wrists, which appears resolved) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform her past relevant work; but (5) retains the RFC to perform a significant number of jobs in the national economy. AR 18-21.

Plaintiff argues that the ALJ (1) erred in failing to call a vocational expert ("VE"); and (2) erred in failing to adopt Dr. Holmboe's assessment that Plaintiff should be precluded from repetitive forceful grasping and gripping.

**DISCUSSION**

A.   Use of a VE

Plaintiff contends that the ALJ's finding that she could not perform repetitive, forceful twisting with either hand was a significant limitation that required the use of a VE.

In general, where a claimant suffers only from exertional limitations, the ALJ may apply the Grids at step five to match the claimant with the appropriate work. *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998). The ALJ may apply the Grids in lieu of taking VE testimony only when the Grids accurately and completely describe the claimant's abilities and limitations. *Id.* (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)). If a claimant's non-exertional limitations "significantly limit the range of work" he can perform, mechanical application of the grids is inappropriate and a VE would be needed to describe what, if any, jobs existed in the national economy that the claimant could perform. *Desrosiers v. Secretary of Housing and*

*Health Services*, 846 F.2d 573, 577 (9th Cir. 1988). The determination of whether a non-exertional limitation significantly limits the range of work the claimant is able to perform is left to the ALJ. *Id.*

While the ALJ found that Plaintiff was exertionally capable of light work, he included a nonexertional limitation of no repetitive, forceful twisting with either hand. AR 19. At step five, the ALJ determined that reliance on the Grids was proper because "the additional limitations have little or no effect on the occupational base of unskilled light work." AR 21. He then applied Rule 202.21 and found that Plaintiff was not disabled. AR 21.

In support of her argument, Plaintiff relies on SSR 85-15. Specifically, she cites the following explanation of the impact of certain manipulative limitations:

> Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a VS may be needed to determine the effects of the limitations.

Certainly, there will be cases where a claimant's manipulative limitations will cause a significant limitation in the range of work available, and SSR 85-15 speaks to that possibility. However, SSR 85-15 does not mandate the use of a VE.[3] Instead, pursuant to Ninth Circuit case law, that determination is left to the ALJ, and where it is supported by substantial evidence, it will not be disturbed.

Here, pursuant to *Desrosiers*, the ALJ turned to the Grids only after determining that Plaintiff's manipulative limitation did not significantly affect the occupational base of unskilled light work. AR 21. This conclusion is consistent with both the medical record and common sense. Plaintiff is precluded from *repetitive, forceful* twisting. This means that she can perform occasional, "gentle" twisting. Moreover, she is not precluded in any way in her ability to reach, grasp, push or pull. When viewed in terms of what she *can* do, her limitation seems far less significant.

---

[3] The Court also notes that SSR 85-15 applies to claimants with *only* nonexertional impairments. For the sake of argument, however, the Court will analyze Plaintiff's contention.

12

Indeed, the medical evidence shows that Plaintiff had complaints, off and on, regarding her wrists and eventually underwent carpal tunnel release on both wrists. Subsequent to her surgery, she was released back to work, with no restrictions. AR 367, 412. Her complaints then focused on her back, and in 2004, when she underwent a consultive examination by Dr. Serrano, her chief complaint was low back pain. Dr. Serrano's limitations were related thereto, and she determined that Plaintiff had no manipulative limitations and full use of her upper extremities. AR 436-437.

It seems that the ALJ was giving Plaintiff the benefit of the doubt by precluding her from repetitive, forceful twisting, and his finding that this restriction did not significantly affect the range of unskilled light work was supported by the evidence. *See eg., Hoopai v. Astrue,* 499 F.3d 1071, 1076 (9th Cir. 2007) (substantial evidence supported ALJ's finding that claimant's depression was not sufficiently severe such that it significantly affects his ability to work beyond the exertional limitations). Her claim is without merit and must be denied.

B.   <u>Dr. Holmboe's Manipulative Limitation</u>

Finally, Plaintiff argues that the ALJ erred in failing to adopt Dr. Holmboe's preclusion from repetitive forceful grasping and gripping activities with either hand.

Dr. Holmboe examined Plaintiff in November 2001, as an Agreed Medical Examiner. AR 399-409. While the opinion of a treating source is entitled to the greatest weight, the opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

In his decision, the ALJ noted Dr. Holmboe's examination and his opinion as to limitations resulting from her back impairment. AR 18. Plaintiff is correct that he did not specifically set forth Dr. Holmboe's manipulative limitation, but he did include a manipulative limitation in her RFC. Although a preclusion from repetitive, forceful twisting is not as restrictive as a preclusion from repetitive, forceful gripping and grasping, it does take his opinion into account as he was the only examining source to impose manipulative restrictions.

The ALJ's implicit rejection of Dr. Holmboe's more limiting restriction was supported by substantial evidence. *See eg., Curry v. Sullivan*, 925 F.2d 1127, 1129 (9th Cir.1991) (failure by the ALJ to articulate or explain the weight given to the reports of the examining or consultative physicians can be harmless error). None of Plaintiff's treating sources imposed permanent manipulative restrictions. Dr. Holmboe found a normal sensory examination in both upper extremities, no tenderness in either wrist, and negative Finkelstein's test, Phalen's test and Tinel's sign. AR 399-408. A lack of supporting clinical findings is a valid reason for rejecting a physician's opinion. *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Dr. Holmboe also determined that Plaintiff's primary problem was in her low back. As to her wrists, he stated that she did "not appear to have any significant symptoms in her right wrist" and indicated that his preclusion was based on her history of surgeries bilaterally. AR 409. In fact, Dr. Holmboe's assessment was performed just seven months after her left carpal tunnel release. AR 399, 405.

While not necessarily rejecting Dr. Holmboe's limitation entirely, the ALJ did not give it controlling weight. He explained that instead, he gave consultive examiner Dr. Serrano's opinion significant weight. AR 20. When confronted with conflicting opinions, it is the ALJ's province to weigh the medical opinions and set forth his interpretations thereof. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Indeed, the court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Id.* Such is the case here, and Plaintiff's claim must be denied.

**CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Brenda L. Brown.

IT IS SO ORDERED.

Dated:   **November 13, 2007**                    /s/ **Dennis L. Beck**
                                                                          UNITED STATES MAGISTRATE JUDGE